IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs May 7, 2013

**ERIC CATHEY v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-09596      James M. Lamey, Jr., Judge**

---

**No. W2012-01460-CCA-R3-PC  - Filed August 30, 2013**

---

The petitioner, Eric Cathey, filed in the Shelby County Criminal Court a petition for post-conviction relief from his convictions of felony murder and aggravated child abuse, alleging that his trial counsel was ineffective. After an evidentiary hearing, the post-conviction court denied the petition, and the petitioner appeals. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Scottie O. Wilkes, Memphis, Tennessee, for the appellant, Eric Cathey.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Jessica Banti, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On direct appeal, see State v. Eric Cathey, No. W2008-01446-CCA-R3-CD, 2010 WL 2836632 (Tenn. Crim. App. at Jackson, July 20, 2010), this court summarized the proof adduced at trial as follows: In the late afternoon of May 9, 2006, the victim, who was the two-month-old daughter of the petitioner and Jennifer Pegg, stopped breathing and became unresponsive. The victim was initially taken to Delta Medical Center and was then transported to Le Bonheur Children's Hospital for further care. Doctors at Le Bonheur Children's Hospital determined that the victim had irreversible brain damage due to serious

brain injuries, which included bleeding, swelling, and subdural hematomas. The injuries were the result of extreme trauma from physical abuse, namely shaking, which was likened to the severity of injuries caused by a car accident. Additionally, x-rays revealed multiple, non-accidental bone fractures to the victim's clavicle, ribs, humerus, both femurs, and both tibias. There were also hemorrhages to both of the victim's retinas. After six days in the hospital, the victim was removed from life support and passed away on May 15, 2006. The proof revealed that the victim's death was caused by injuries that were intentionally inflicted sometime between 5:00 and 5:30 p.m. on May 9, 2006, at which time the victim was in the sole care of the petitioner. The petitioner testified that when he realized the victim was unresponsive, he tried to administer CPR. The petitioner later told the police that he shook the victim in an attempt to wake her but that he had not shaken her hard enough to cause the injuries. The petitioner could not explain the victim's injuries. Id. at *1-9.

The jury convicted the petitioner of felony murder, aggravated child abuse, and aggravated child neglect. Id. at *1. The trial court merged the child neglect conviction into the child abuse conviction and imposed a sentence of twenty years. Id. The court imposed a concurrent sentence of life imprisonment for the murder conviction. Id. On direct appeal, this court affirmed the petitioner's convictions and sentences. Id.

Subsequently, the petitioner filed a petition for post-conviction relief, alleging that his trial counsel was ineffective by failing to investigate the case and by failing to hire a medical expert.

At the post-conviction hearing, the appellant's sister, Latasha Cathey, testified that trial counsel represented the petitioner for approximately sixteen months. During that time, the petitioner's mother was usually the person with whom counsel spoke, but Ms. Cathey occasionally left voicemail messages for trial counsel. Ms Cathey stated that counsel failed to investigate the case, noting that few of the petitioner's family members were contacted to speak about his character. Ms. Cathey acknowledged that an investigator also worked on the petitioner's case but maintained that she did not speak with the investigator. She stated that the petitioner had babysat for children and that her children liked being around him. In her opinion, the petitioner would not have harmed his own child.

Ms. Cathey said that the petitioner and Pegg frequently argued and that Pegg had threatened the petitioner. Counsel should have investigated the petitioner and Pegg's contentious relationship and presented proof about Pegg's character.

Ms. Cathey said that she, her mother, and her cousin, Crystal Brown, met with trial counsel only once. The meeting occurred approximately two weeks prior to trial and lasted thirty to sixty minutes. Counsel did not tell them what motions had been filed or explain the

theory of defense. Instead, they discussed the petitioner's statement and what happened on the day of the offense.

Ms. Cathey stated that on May 9, 2006, after the victim was taken to the hospital, she went to the hospital. She saw the petitioner, and he was distressed, distraught, and crying. The petitioner did not sleep while Ms. Cathey was at the hospital. Pegg was also at the hospital, and she was unemotional, nonchalant, and quiet.

On cross-examination, Ms. Cathey acknowledged that she testified at the petitioner's trial, mostly about the petitioner's character. She conceded that she was not present during meetings the petitioner had with trial counsel and did not know what they had discussed. Prior to trial, counsel never asked about the petitioner's relationship with Pegg, and Ms. Cathey never volunteered the information. Additionally, Ms. Cathey did not inform trial counsel about potential character witnesses. Ms. Cathey acknowledged that she was aware the petitioner had two prior assault convictions and that the victim of one of the assaults was the mother of the petitioner's other child. Ms. Cathey conceded that any character witness could have been asked about the petitioner's violent criminal past on cross-examination.

The petitioner's first cousin, Crystal Shavonne Brown, testified that she, Ms. Cathey, and the petitioner's mother met with trial counsel once, shortly before trial. Trial counsel "showed [them] a lot of paperwork of the docket, what was going on" and asked about the relationship between the petitioner and the victim. Brown stated that trial counsel did not give them much information and failed to answer many of the family's questions.

Brown said that she wanted Pegg to be investigated because she was also home with the victim on the day she was injured. However, Pegg was not investigated. Brown did not know of any problems in the petitioner's relationship with Pegg but had heard that Pegg went to the petitioner's workplace, "cutting up people a couple of times."

Brown acknowledged that she did not know the petitioner provided trial counsel with a list of potential character witnesses. Brown was unaware of any other investigation that occurred. Brown would have testified that the petitioner was good with children, loved the victim, and would not have done anything to hurt her.

Brown said that she went to the hospital after the victim was admitted and saw that the petitioner was distraught and crying. Pegg was also at the hospital, but she showed no emotion.

On cross-examination, Brown acknowledged that she was not present for the meetings between the petitioner and trial counsel and did not know what they discussed. Brown

informed trial counsel that the petitioner was good with children. Brown said that she would have testified that the petitioner had good character even though she knew he had two prior convictions for assault. Brown said that she watched the petitioner's entire trial and heard Ms. Cathey testify about the petitioner's character and about Pegg's behavior.

The petitioner testified that trial counsel represented him for fourteen to sixteen months. During that time, they met four or five times at the jail, and each visit lasted one to one and one-half hours. At each of the petitioner's numerous court dates, trial counsel spoke with him for a few minutes. Each of his meetings with counsel consisted of "recapping what happened in the case and not findings of the case or any evidence that [trial counsel] may have c[o]me across or investigated or anything like that. It was[] never a conversation about anything . . . being productive as evidentiary wise."

The petitioner contended that counsel should have filed a motion to suppress his statement to police. He explained that at the time he was interviewed, he had been awake for approximately thirty-two hours. The petitioner was concerned about the victim and did not understand why the investigation was focused on him. The petitioner was handcuffed and was not advised that he could leave, that he did not have to give a statement, and that he could have an attorney. The petitioner signed an "Interrogation Advice of Rights" form prior to the interview because he wanted to cooperate. He asserted that he was not in the "right state of mind" to give a statement. Trial counsel never asked the petitioner about the circumstances surrounding the statement.

The petitioner maintained that he told counsel to investigate whether Pegg committed the offense. He thought Pegg was jealous of his relationship with the victim. He explained that he and the victim had a strong bond and that he was capable of soothing the victim when Pegg could not. The petitioner recalled that two days before the incident, he was holding the victim when he and Pegg began arguing about a check stub she found in his wallet. Pegg "snatched" the victim from his hands, and the petitioner tried retrieve the victim. Pegg "jerk[ed]" the victim away, and the victim's head hit the wall. The petitioner told trial counsel about the injury, but counsel never investigated the incident or mentioned it at trial. Additionally, the petitioner alleged that Pegg was an angry person, that she had harassed him at work, and that she had vandalized his car.

The petitioner said that he gave counsel a list of the names, telephone numbers, and addresses of potential character witnesses who knew of Pegg's prior aggressive acts toward the petitioner and who had seen him interact with children, including the victim. He and trial counsel discussed having them testify at trial, but counsel never contacted them. One of the prospective witnesses was Yolanda Marshall, the petitioner's former girlfriend, who attended the petitioner's trial but was not called to testify. The petitioner maintained that he thought

-4-

the investigation into his case was "ignored." The petitioner wanted more witnesses called on his behalf.

The petitioner acknowledged that on cross-examination, trial counsel asked Pegg if she was jealous of the petitioner's relationship with the victim. However, he contended that the cross-examination was not "detailed." He asserted that the witnesses he suggested "could have brought this information out."

The petitioner said that he did not know the theory of defense until opening statements when he heard counsel emphasize that the State had the burden of proof. The petitioner stated, "I knew then that we didn't really have . . . any kind of offense [sic] going into this trial." The petitioner said that trial counsel did not prepare him to testify. She told him that the State would try to upset him but that he needed "to keep [his] cool and just tell [his] story." The petitioner stated that counsel never informed him of any plea offers and that he would have considered a plea offer.

The petitioner acknowledged that he had two prior assault convictions. The victims were the mother and grandmother of the petitioner's oldest son. The petitioner said that his son's mother was on his potential witness list. The petitioner said that his sister, Ms. Cathey, testified at his trial, and he acknowledged that counsel stopped her direct examination of Ms. Cathey prior to opening the door to evidence of the petitioner's criminal history. The petitioner would have preferred that character witnesses testify on his behalf, even if such testimony risked revealing his criminal past. Trial counsel did not ask his opinion on the matter. The petitioner stated that trial counsel never discussed the witnesses she would call. The petitioner wanted to call more witnesses than just himself and Ms. Cathey.

The petitioner said that trial counsel should have obtained a medical expert. He explained that the doctors who testified at trial had differing opinions regarding how the victim's injuries occurred. He believed another expert could have clarified what happened to the victim and when it happened.

Approximately one week prior to trial, trial counsel told the petitioner that she would speak with the medical examiner. The petitioner said that trial counsel gave him a copy of the medical examiner's report, but she did not give him a complete copy of the victim's medical records. He acknowledged that trial counsel gave him a "medical and social work note from LeBonheur," which indicated that Pegg or Pegg's mother told a social worker that she overheard Marshall tell the petitioner not to mention that Marshall had been at his home on the day of the offense. The petitioner thought the note indicated that Pegg was attempting to "[]point the finger at [him] and get more attention off her."

On cross-examination, the petitioner said that he gave the list of potential witnesses to trial counsel the day they met. However, he conceded that none of the witnesses were at the house on the day of the offense and that the witnesses could only have testified regarding the petitioner's or Pegg's character. The petitioner acknowledged that one of the witnesses on his list, Ms. Cathey, testified on his behalf at trial.

Regarding his statement, the petitioner maintained that trial counsel should have filed a motion to suppress his statement to the police. He stated that he was not advised that he did not have to give a statement. He acknowledged that in the statement, he did not admit to killing the victim or to intentionally causing her injuries; however, he did state that he shook the victim. He further acknowledged that the police advised him of his Miranda rights prior to the statement.

Trial counsel testified that she began representing the petitioner in January or February 2007. The petitioner's trial was originally scheduled for November 2007 but was postponed until April 2008. Trial counsel spoke with the petitioner at each court appearance and met with him several times at the jail. They discussed the case, including the State's proof, the defense's response to that proof, and any potential witnesses.

Trial counsel said the petitioner told her that his family and friends did not visit him often while he lived with Pegg and the victim and that he was the only person at the residence when the victim became unresponsive. Trial counsel stated that the petitioner did not give her a list of potential witnesses and asserted that if she had been provided the list, she would have had an investigator contact the individuals. The petitioner provided the names and telephone numbers of his sister and his mother because they were the only people who had seen him interact with the victim. Trial counsel met with the petitioner's mother and sister, and they told her they had seen the petitioner with the victim once for a short amount of time when the petitioner helped his mother move. During the meeting, they decided that Ms. Cathey would be a better witness and that the petitioner's mother would not have been able to add anything to Ms. Cathey's testimony. Trial counsel informed the petitioner that Ms. Cathey would be a character witness.

Trial counsel said that she provided the petitioner with "a social work note" from the victim's medical records in order to question whether he was "covering up for someone else." The petitioner consistently told counsel "that the baby became unresponsive, there had been no other trauma, no other violence to the baby throughout that whole day, that he was the only one that was there with the baby when the baby became unresponsive and he was the one that shook her." The statements given to police by Pegg and Pegg's mother corroborated the petitioner's version of events.

Trial counsel acknowledged that the petitioner told her that he and Pegg argued frequently and that Pegg was violent. Trial counsel did not recall the petitioner mentioning that Pegg came to his work place and slashed his tires.

Trial counsel said that she consulted an emergency room nurse in the public defender's office and that they reviewed the victim's medical files. Trial counsel stated that "the doctor's reports . . . were consistent with basically right along the time when she was injured." Accordingly, trial counsel felt that hiring a medical expert was unnecessary.

Trial counsel did not think that a motion to suppress the petitioner's statement would have been successful. Moreover, counsel noted that in his statement, the petitioner had not admitting killing the victim. Counsel believed the statement was beneficial and helped demonstrate that the petitioner was a considerate caregiver. She said that the petitioner's trial testimony was consistent with his statement.

Trial counsel said she asked the State to make a plea offer, but she was informed that the victim's mother insisted upon a trial. Counsel advised the petitioner that no plea offer was forthcoming.

On cross-examination, trial counsel said that at each of the petitioner's court appearances, they spoke for at least ten to fifteen minutes and that they once spoke for thirty minutes. Trial counsel acknowledged that the petitioner gave her Sheena Collins's name and telephone number as a potential witness and that she did not recall ever speaking with Collins. Trial counsel also did not recall speaking with Yolanda Marshall. Trial counsel said that if Marshall had called counsel's office, counsel would have instructed an investigator to return the call.

Trial counsel acknowledged that the petitioner told her about the argument he and Pegg had before the victim's death. Trial counsel went over the medical reports with the petitioner. Counsel said that she did not meet with the medical examiner until approximately one week before trial but that she had the medical examiner's report much earlier.

Trial counsel said that she considered filing a motion to suppress the petitioner's statement but that she did not have any grounds to suppress. Moreover, she thought the statement was more helpful than harmful because it revealed the petitioner was "caring and compassionate" with the victim. She said that if the petitioner had been awake for thirty-two hours prior to making the statement, it was "a factor but not a determining factor" in having the statement suppressed.

Trial counsel said that during her visits with the petitioner at the jail, they often

-7-

"rehash[ed]" the facts of the case because "[n]othing had changed in the case. Nothing new had developed. There was nothing more to share with [the petitioner]. He hadn't given me anything new. I had nothing new for him." Trial counsel acknowledged that the petitioner's statement revealed that he was the only person with the victim after 3:00 p.m.; however, she said, "That's the only hurtful thing I saw in the statement, double-edged sword, basically." She stated that without the petitioner's statement, the testimony of Pegg and her mother could have placed the petitioner with the victim at the time she became unresponsive.

Trial counsel said that Dr. Bugnitz testified that the injuries had occurred within twelve to twenty-four hours prior to the victim's admission to the hospital. She said that Dr. Chancellor may have stated that the injuries occurred six or seven days prior to her examining the victim, but counsel explained that "by the time Dr. Chancellor got the baby, the baby had been on life support that long." Trial counsel further stated that Dr. Chancellor "could not pinpoint the exact time [of injury] because of all that."

Trial counsel asserted that she investigated the case, spoke with the witnesses suggested by the petitioner, and attempted to interview Pegg, who refused to cooperate. Counsel frequently spoke with the petitioner about the case.

At the conclusion of the hearing, the post-conviction court said that the petitioner's statement was self-serving, logical, and did not appear to have been given by someone who was "punch-drunk from being awake so long." The court further found that trial counsel did not err by failing to file a motion to suppress, noting that there was no basis for the motion. The court observed that, in addition to the petitioner's statement, Pegg's testimony also put the petitioner alone with the victim at the estimated time of the injury. The court accredited trial counsel's testimony that the petitioner did not provide her an extensive list of possible witnesses. Moreover, the court noted that testimony regarding the petitioner's good character would have allowed the jury to hear evidence regarding his two assault convictions. The court noted that evidence of the petitioner's abuse of his girlfriend could have led the jury to believe the petitioner would not hesitate to hurt his child. Therefore, the post-conviction court determined that trial counsel made a sound, tactical decision to not have numerous witnesses testify regarding the petitioner's general good character. The court found that the petitioner presented no evidence to show that further investigation or more meetings with the petitioner would have been helpful. Finally, the court said, "[Y]ou can't say that counsel's performance prejudiced this [petitioner]. Clarence Darrow couldn't have done anything with this. . . . I can't even imagine what – without absolutely making up things, what else could have been done." In sum, the court found that counsel was not ineffective. On appeal, the petitioner challenges this ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

The petitioner contends that trial counsel was ineffective by failing to investigate the petitioner's case, specifically arguing that counsel should have contacted all of the people on a list provided by the petitioner. The petitioner wanted the witnesses to verify that Pegg was angry, violent, and jealous of the petitioner's relationship with the victim. The post-conviction court accredited trial counsel's testimony that the petitioner did not provide her a list of over twenty potential witnesses and that the petitioner told trial counsel that his mother, his sister, and Marshall were the only witnesses who could potentially testify on his behalf. Moreover, the only witnesses to testify at the post-conviction hearing were Ms. Cathey and Brown. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on any benefit these witnesses would have offered to the petitioner's case, nor may we guess as to what evidence further investigation may have uncovered. Id.

Regarding Ms. Cathey and Brown, we note that Ms. Cathey testified at the petitioner's trial that the petitioner had a good relationship with the victim, but she did not testify about Pegg's violent acts. Brown did not testify at trial; however, she stated at the post-conviction hearing that she heard Pegg went to the petitioner's workplace, "cutting up people a couple of times." At the post-conviction hearing, Ms. Cathey and Brown conceded that they knew the petitioner had two prior convictions for assault. The post-conviction court found that trial counsel made a well-reasoned, tactical decision to not call witnesses or delve into areas which could potentially result in the admission of evidence of the petitioner's prior criminal convictions. Generally, "[a]llegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." Taylor v. State, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). There is nothing to preponderate against the post-conviction court's finding that the petitioner is not entitled to relief on this basis.

The petitioner also contends that counsel should have filed a motion to suppress his statement on the basis that he was awake for thirty-two hours before giving the statement and "was not in his right mind" to give the statement. Generally, in determining whether a statement was knowingly and voluntarily made, courts look to the totality of the circumstances. State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000). Notable factors in determining the voluntariness of a confession are the appellant's age; education or intelligence level; previous experience with the police; the repeated and prolonged nature of the interrogation; the length of detention prior to the confession; the lack of any advice as to constitutional rights; the unnecessary delay in bringing the appellant before the magistrate prior to the confession; the appellant's intoxication or ill health at the time the confession was given; deprivation of food, sleep, or medical attention; any physical abuse; and threats of abuse. See State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996). The post-conviction

court found that the petitioner's statement was voluntarily made. The court further found that there was no basis to suppress the statement. There is nothing in the record to preponderate against this finding.

Finally, the petitioner maintains that trial counsel should have hired a medical expert. The petitioner asserts that the doctors who testified at trial had differing opinions regarding the time the victim's fatal injuries were inflicted. Trial counsel testified that Dr. Bugnitz opined that the injuries occurred twelve to twenty-four hours prior to the victim being admitted to the hospital. She said that Dr. Chancellor may have stated that the injuries occurred six or seven days prior to her seeing the victim, but counsel explained that "by the time Dr. Chancellor got the baby, the baby had been on life support that long." The transcript of the petitioner's trial confirms trial counsel's testimony. The petitioner failed to adduce any proof that another medical expert would have testified any differently than those who testified at his trial. Moreover, the post-conviction court stated that " if the child was on life support for six days, . . . I don't think there is an expert in the world that could pinpoint exactly when this happened." Accordingly, there is nothing in the record to preponderate against the post-conviction court's finding that the petitioner is not entitled to relief.

### III.  Conclusion

In sum, we conclude that the record does not preponderate against the post-conviction court's ruling that counsel was not ineffective and that the petitioner's statement was voluntary. Therefore, we affirm the judgment of the post-conviction court.

_____
NORMA McGEE OGLE, JUDGE

-11-